IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| AUTO MONEY NORTH, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CA No.:  2:21-cv-118-RMG |
| v. | ) | |
| | ) | |
| GLENNIE LAMAR NIXON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Auto Money North, LLC ("Plaintiff" or "AutoMoney"), by and through its undersigned counsel, brings this action against Defendant Glennie Nixon (the "Defendant") for Declaratory Judgment under 28 U.S.C. § 2201 and FED. R. CIV. P. 57. Specifically, this action asks this Court to determine whether the Plaintiff's consumer loan to Defendant is valid and enforceable under the relevant South Carolina consumer lending laws and are not subject to or invalidated by or in violation of the North Carolina Consumer Finance Act (N.C.G.S. §§ 53-163, *et seq.*) (the "NC Finance Act"), North Carolina usury law (N.C.G.S. §§ 24-1.1, *et seq.*) ("NC Usury Law"), and the North Carolina Unfair and Deceptive Trade Practices Act (N.C.G.S. §§ 75-1.1, *et seq.*) ("the "NC UDTPA") or, in the alternative, whether the relevant North Carolina lending statutes violate the United States Constitution, Article I, § 8, cl. 3 (the "Commerce Clause"). The issues are laid in more detail in the allegations set forth below.

## PARTIES, JURISDICTION, VENUE

1.      Plaintiff is a South Carolina limited liability company with its principal place of business at 450 Meeting Street, Charleston, South Carolina. Plaintiff was organized in May 2019. In November 2019, Plaintiff was assigned certain lending contracts originated by AutoMoney, Inc., including but not limited to the title loan documents relevant to this action.

2.      AutoMoney, Inc. is a South Carolina corporation with its principal place of business at 450 Meeting Street, Charleston, South Carolina.

3.      Plaintiff and AutoMoney, Inc. are regulated lending entities that make consumer loans as a "supervised lender" under South Carolina statute. Specifically, Plaintiff and AutoMoney, Inc. make consumer loans secured by vehicle titles—commonly referred to as "title loans." As will be set out further below, title loans made by Plaintiff and AutoMoney are "supervised loans" subject to auditing and inspection by the Consumer Finance Division of the South Carolina Board of Financial Institutions.

4.      Upon information and belief, Defendant is a citizen and resident of New Hanover County, North Carolina.

5.      Defendant voluntarily traveled to Plaintiff's store in North Myrtle Beach, South Carolina for the purposes of negotiating, applying to borrow, and

accepting AutoMoney Inc.'s offer of a loan with a security interest in the title to Defendant's vehicle.

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 2201 in that the Complaint asserts claims arising under the Constitution and laws of the United States and seeks a declaration of rights and other legal relations under the Constitution and laws of the United States.

7.     Alternatively, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is diversity of citizenship and the amount in controversy exceeds $75,000.00.

8.     Venue is proper in South Carolina pursuant to 28 U.S.C. § 1391(b)(2) (2018) because all acts giving rise to the contractual agreement and the claims took place in South Carolina.  More specifically, this is the district where the Loan Agreement, Promissory Note and Security Agreement were entered into between the parties and is the state whose laws govern under the choice of law provision of the Loan Agreement, Promissory Note and Security Agreement.

9.     Plaintiff files this declaratory judgment action to determine its prospective liability to Defendant.

10.     The Court's declaration as to the legal relationship between the parties and/or the applicability or constitutionality of certain provisions of the

North Carolina Consumer Finance Act will clarify the unsettled legal issues between the Plaintiff and Defendant, and similarly situated customers.

11.    This Court has a substantial public interest in determining whether Plaintiff as a licensed supervised lender and regulated entity by South Carolina's Department of Consumer finance is in compliance with the applicable lending laws.

## PROCEDURAL HISTORY

12.    Plaintiff incorporates the allegations of paragraphs 1 through 11 as if fully set forth herein.

13.    There is no better or more efficient alternative to resolve the legal issues and relationships between the parties than through this declaratory judgment action as Defendant is engaging in forum shopping to deprive Plaintiff from having the issues heard in Federal Court.  This forum shopping is resulting in an unfair harm to the Plaintiff.

14.    The Defendant previously filed a complaint in the North Carolina Superior Court located in Guilford County on October 12, 2020 captioned *Glennie Nixon v. AutoMoney, Inc. and AutoMoney North, LLC,* CA No. 20-cvs-7722 (the "State Court Action").    Even though the Defendant resides in Wilmington, NC

Defendant's counsel decided to file the State Court Action in Guilford County, over 200 hundred miles North-West of Wilmington.

15.     Counsel for the Defendant chose to file the State Court Action on behalf of Defendant, even though the same lawyers had filed a separate case over a year and a half earlier which is still pending and includes the Defendant's brother, Isaiah Nixon as a plaintiff and involving the same loans. Defendant filed the State Court Action separately presumably because it was discovered that Defendant, and not his brother Isaiah, made all or substantially all the payments on the loans.

16.     The Defendant's complaint in the State Court Action sought four types of relief that contribute to the amount in controversy: (1) trebled monetary damages in the amount of the payments made on his loan, (2) declaratory relief voiding the loan, (3) an injunction preventing Plaintiff from enforcing its right to payment of the remaining loan balance, and (4) attorneys' fees. The total potential harm to Plaintiff under Defendant's claims exceeds $75,000.00.

17.     Plaintiff then timely filed a notice of removal of the State Court Action with the United States District Court for the Middle District of North Carolina on November 19, 2020 pursuant to 28 U.S.C. § 1332(a) because there was diversity of citizenship and the amount in controversy exceeds $75,000.00. The removed action

was captioned *Glennie Nixon v. AutoMoney, Inc. and AutoMoney North, LLC,* CA No.

1:20-cv-1046 (the "Federal Court Action").

18.    Defendant filed a motion to remand the Federal Court Action, and

Plaintiff opposed the remand.  As demonstrated in Plaintiff's opposition to the

remand and supporting affidavit, adding the value of the declaratory and

injunctive relief, Defendant's claim for monetary damages based on the payments

made from his bank account resulted in an amount in controversy of $76,762.36. A

chart summarizing the calculation is below:

| Claim | Damage Amount |
|---|---|
| Defendant's UDTPA Claim on 50% of payments | $18,919.14 * 3 = $56,757.42 |
| Declaration that loan is void and disgorgement of other 50% of payments to brother. | $18,919.14 |
| Injunction barring further collection | $1,085.80 |
| **Total** | **$76,762.36** |

19.    Defendant also sought an award of attorney's fees, pursuant to the

Unfair and Deceptive Trades Practices Act. Where a statute authorizes payment of

attorneys' fees, those fees may be included in the amount in controversy. *Francis*

*v. Allstate Ins. Co.*, 709 F.3d 362, 368-9 (4th Cir. 2013). At the very least, $25,000.00

would be the bare minimum of attorneys' fees for the prosecution of a federal case

through trial. The total damages far exceed the jurisdictional requirement of $75,000.00.

20.    Ultimately, Defendant appears to have conceded that the jurisdictional threshold of $75,000.00 and diversity requirement were met as Defendant voluntarily dismissed his complaint under Fed. R. Civ. P. 41 the day after AutoMoney filed its opposition to the remand.

21.    This South Carolina Federal Court is the most appropriate jurisdiction and venue to adjudicate the issues raised in the Federal Court Action. Specifically, AutoMoney cannot bring this action in the United States District Courts located in North Carolina because the filling of such action could potentially waive its lack of personal jurisdiction defenses that have been asserted in the other state court actions with other consumers currently pending in North Carolina. Hearing the matter here allows the Plaintiff to maintain and preserve those defenses.

## GENERAL FACTUAL BACKGROUND

22.    Plaintiff incorporates the allegations of paragraphs 1 through 21 as if fully set forth herein.

23.    While the Defendant's title loans were originally obtained from AutoMoney, Inc., Plaintiff currently operates the locations from which the Defendant obtained his loans and has been assigned by contract the Defendant's loan agreements and other documents.

24.     AutoMoney, Inc. and Plaintiff do not make loans within the State of North Carolina.

      a.     They do not have any store locations in North Carolina.

      b.     They do not maintain employees or agents in North Carolina.

      c.     They do not have bank accounts in North Carolina.

      d.     They do not negotiate loans or make offers to lend money over the phone, email, or the internet with North Carolina customers.

      e.     They do not sign any loan documents in North Carolina.

      f.     They do not disburse loan proceeds in North Carolina, but from South Carolina bank accounts.

      g.     They do not maintain North Carolina bank accounts.

      h.     They do not have any assets in North Carolina.

      i.     Any payments received are received in South Carolina and deposited into South Carolina bank accounts.

25.     AutoMoney, Inc. and Plaintiff only make loans within the State of South Carolina as required by the applicable consumer lending laws.

      a.     All loan applications are made in person in the State of South Carolina, including the Defendant's applications.

      b.     All loan offers are made in person in the State of South Carolina, including the offers made to the Defendant.

c.    All title loan documents are executed in South Carolina, including those of the Defendant.

d.    Funds passing from AutoMoney, Inc. or Plaintiff to the borrower are distributed only in South Carolina, including those distributed to the Defendant.

e.    AutoMoney, Inc. and Plaintiff only receive payment from borrowers in South Carolina, including those from the Defendant.

## OVERVIEW OF SOUTH CAROLINA CONSUMER LENDING LAWS

26.    Plaintiff incorporates the allegations of paragraphs 1 through 25 as if fully set forth herein.

27.    AutoMoney and Plaintiff are regulated and licensed supervised lenders by South Carolina, and they operate in accordance with South Carolina law.

28.    The South Carolina Consumer Protection Code (S.C. Code. Ann. § 37-3-101, *et seq.*) (the "SC Consumer Protection Code") applies to consumer loans including supervised loans. S.C. Code Ann. § 37-3-102.

29.    A "consumer loan" is defined at S.C. Code Ann. § 37-3-104 as:

a loan made by a person regularly engaged in the business of making loans in which:

(a)    the debtor is a person rather than an organization;

(b)    the debt is incurred primarily for personal, family, or household

(c)    either the debt is payable in installments or a loan finance charge is made; and

(d)    either the principal does not exceed twenty-five thousand dollars or the debt is secured by an interest in land.

30.    The title loans issued by AutoMoney, Inc., including the loans issued to the Defendant, are "consumer loans" under South Carolina law.  They are:

a.    a loan to a person and not an organization;

b.    incurred for primarily personal, family, or household purposes;

c.    a debt payable in installments; and

d.    for a principal amount below the $25,000 statutory limit and are not secured by land.

31.    Consumer loans may be further regulated as "supervised loans" under Part 5 of the SC Consumer Protection Code, S.C. Code. Ann. §§ 37-3-500 through 37-3-515.

32.    A "supervised loan" is defined at S.C. Code Ann. § 37-3-501(1) as "a consumer loan in which the rate of the loan finance charge exceeds twelve percent per year as determined according to the provisions on the loan finance charge for consumer loans."

33.    The term "loan finance charge" is defined at S.C. Code Ann. § 37-3-109(1)(a) as including:

All charges payable directly or indirectly by the debtor and imposed directly or indirectly by the lender as an incident to the extension of credit, including any of the following types of charges which are applicable: interest or any amount payable under a point, discount or other system of charges, however denominated, premium or other charge for any guarantee or insurance protecting the lender against the debtor's default or other credit loss, and, except as otherwise provided in this section….

34. S.C. Code Ann. § 37-3-501(1) further defines a "supervised loan" by stating *exclusions* from that definition, including:

(a) a mortgage loan as defined in Section 37-22-110(30); or

(b) a closed end credit transaction, with an original repayment term of less than one hundred twenty days, unsecured by any interest in the consumer's personal property or secured by personal property, excluding motor vehicles that are free of any other liens or encumbrances, that does not have a market value that reasonably secures the amount of the loan, and the consumer:

(i) receives funds from and incurs interest or a fee payable to a creditor, and contemporaneously with, or any time after, the receipt of funds, provides a check or other payment instrument to the creditor who agrees with the consumer not to deposit or present the check or payment instrument; or

(ii) receives funds from and incurs interest or a fee payable to a creditor, and contemporaneously with, or any time after, the receipt of funds, authorizes the creditor to initiate a debit or debits to the consumer's deposit account by electronic fund transfer or a remotely created check or remotely created consumer item as defined in Section 36-3-103(16).

35.     The title loans issued by Plaintiff and AutoMoney, Inc., including the loans issued to the Defendant, are "supervised loans" under the South Carolina Consumer Protection Code.   They are for the personal use of consumers, are subject to loan finance charges in excess of twelve percent, are secured by motor vehicle titles, are not under secured, and, except as will be set out further below, are generally payable for a period of twelve to twenty-four months. They do not fall under any of the exclusions set forth in S.C. Code Ann. § 37-3-501(1).

36.     The South Carolina Consumer Protection Code provides that no one other than a supervised financial organization or a licensed "supervised lender" may make supervised loans. S.C. Code Ann. § 37-3-502; see also S.C. Code Ann. § 37-3-501(2) (defining a "supervised lender" as a "a person authorized to make or take assignments of supervised loans").

37.     A supervised lender license can only be issued after the party requesting such license applies for, and otherwise qualifies to receive, a license. S.C. Code Ann. § 37-5-503. Maintaining a supervised lender license requires maintaining specific reporting requirements, as set out in S.C. Code Ann. § 37-3-505, remaining subject to examination or investigation by the State Board of Financial Institutions, as set out in S.C. Code Ann. § 37-3-506, and otherwise remaining in compliance with the South Carolina Consumer Protection Code.

38.    If a supervised lender operates from multiple locations, like AutoMoney, Inc. and Plaintiff, a separate license is required for each location pursuant to S.C. Code Ann. § 37-3-503(4).

39.    The title loans between the Defendant and AutoMoney, Inc. were executed at the location in North Myrtle Beach, South Carolina, which, at all times relevant, held a valid supervised lender license.  Plaintiff now owns and operates the foregoing locations and maintains a valid supervised lender license for each location.

40.    Pursuant to S.C. Code Ann. § 37-3-305, all supervised lenders located within the State of South Carolina must file a rate schedule indicating the maximum interest such lenders would charge to any given borrower with the South Carolina Department of Consumer Affairs and post the filed maximum rate in a conspicuous place in the location where the loan contracts are executed. Such filing and posting must be completed for each individual location, and filing is an annual requirement. S.C. Code Ann. 37-3-305(7).

41.    All on-site rate postings must bear the below language in no-less-than fourteen- point-font:

> Consumers: All supervised and restricted creditors making consumer loans in South Carolina are required by law to post a schedule showing the maximum rate of LOAN FINANCE CHARGES stated as ANNUAL PERCENTAGE RATES that the creditor intends to charge for various types of consumer credit transactions.

The purpose of this requirement is to assist you in comparing the maximum rates that creditors charge, thereby furthering your understanding of the terms of consumer credit transactions and helping you to avoid the uninformed use of credit.

NOTE: Creditors are prohibited only from granting consumer credit at rates higher than those specified above. A creditor may be willing to grant you credit at rates that are lower than those specified, depending on the amount, terms, collateral and your credit worthiness.

S.C. Code Ann. § 37-3-305(3).

42.    At all times relevant, the AutoMoney North Myrtle Beach store met the above filing and posting requirements for its maximum rate schedule, which indicated that loans issued by that location could bear interest at a rate of up to 300%. The 300% maximum rate has been the customary maximum rate filed and maintained by all the locations at all times relevant. The State of South Carolina approved the maximum rate schedules for the North Myrtle Beach location, and the certificates are posted in each location.  A copy of the North Myrtle Beach's supervised lender's license and published rate schedule are attached hereto as Exhibit 1.

43.    The South Carolina Consumer Protection Code further provides specific, more stringent provisions for "short term vehicle secured loans," which are nonpurchase money consumer loans secured by vehicle titles with an original repayment period of greater than one month and less than 120 days. S.C. Code

Ann. § 37-3-413(1) & (2). Short term vehicle secured loans may be renewed for up to 240 days from the original date of the loan. S.C. Code Ann. § 37- 3-413(2).

44.    Short term vehicle secured loans are governed by stricter regulations than ordinary supervised loans. Lenders must require borrowers to furnish information on employment, income, and expenses; borrowers must sign a statement attesting to their ability to repay the amount borrowed; lenders may not loan any amount greater than the fair market value of the collateral vehicle; and loan documents must state a conspicuous notice in fourteen-point-font stating: "THIS IS A HIGHER INTEREST LOAN. YOU SHOULD GO TO ANOTHER SOURCE IF YOU HAVE THE ABILITY TO BORROW AT A LOWER RATE OF INTEREST. YOU ARE PLACING YOUR VEHICLE AT RISK IF YOU DEFAULT ON THIS LOAN." S.C. Code Ann. §§ 37-3-413(3), (4), and (6)(a).

45.    The loans with Defendant do not qualify as "short term vehicle secured loans" under the South Carolina Consumer Protection Code because they are for a two-year period. Even though the loans to the Defendant are not a "short-term vehicle secured loan" under South Carolina law, the Defendant was required to submit employment and financial information as part of the application process, the loan was for no more than the fair market value of the collateral (as will be discussed further), and the loan agreement itself bore the "higher interest rate" notice set out above. True and correct copies of the Loan Agreement, Promissory

Note, and Security Agreement by and between each Defendant and AutoMoney, Inc. are attached hereto as <u>Exhibits 1 & 2</u>.

46.    Plaintiff continues to comply with the aforementioned South Carolina licensure and consumer protection laws in the operation of locations previously operated by AutoMoney, Inc.

**SPECIFIC FACTS RELATED TO DEFENDANT'S LOAN**

47.    Plaintiff incorporates the allegations of paragraphs 1 through 46 as if fully set forth herein.

48.    On March 1, 2018, the Defendant voluntarily traveled to AutoMoney, Inc.'s location in North Myrtle Beach, South Carolina for the purposes of negotiating, applying to borrow, and accepting AutoMoney, Inc.'s offer of a loan with a security interest in the title to Defendant's vehicles.

49.    While the Defendant was present at AutoMoney, Inc.'s store in North Myrtle Beach, the Defendant completed a Customer Application for a title loan. AutoMoney, Inc. reviewed the Customer Application, appraised and photographed the Defendant's vehicle, negotiated the terms of a title loan, and prepared a Loan Agreement, Promissory Note, and Security Agreement setting forth the terms of the loan.   Defendant then executed the Loan Agreement, Promissory Note, and Security Agreement being Contract Number 2945, which is attached as <u>Exhibit 2</u>.

50.    On April 11, 2018, Defendant again traveled to North Myrtle Beach and entered into a subsequent Loan Agreement, Promissory Note, and Security Agreement being Contract Number 2973, which is attached as <u>Exhibit 3</u>.

51.    The Defendant executed all the aforesaid lending documents to obtain loans (the "<u>Loans</u>") in exchange for a security interest in his vehicle (the "<u>Collateral</u>"). The Collateral is titled in the Defendant's name. The Defendant signed other documentation relating to the Defendant's responsibilities, guidelines, and authorized the recording of a lien against the vehicle's title.

52.    All the foregoing activities, including the offer, acceptance and execution of the Loans and the granting of the security interest in the Collateral, occurred on-site at the AutoMoney, Inc. location in North Myrtle Beach.

53.    Both loan agreements executed by the Defendant contain a paragraph recognizing that the agreements are formed in South Carolina with a mandatory South Carolina choice of law provision:

> This Loan Agreement, Promissory Note and Security Agreement (the "Agreements") are entered into by and between Lender/Secured Party and Borrower/Debtor (the "Parties") in the state of South Carolina as of the above date, subject to the terms and conditions set forth and any and all representations Borrower has made to Lender in connection with these Agreements were made in South Carolina.  As Lender is a regulated South Carolina consumer finance company and you, as Borrower, have entered into this Agreement in South Carolina, this Agreement shall be interpreted, construed, and governed by and under the laws of State of South Carolina, without regards to conflicts of law rules and principles (whether of the State of South Carolina or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of South Carolina.

(Exhibits 2 & 3.)  The Defendant initialed this paragraph in both loan agreements to acknowledge and consent to the law of South Carolina and that the agreements were entered into in South Carolina.

54.    To apply for a loan with AutoMoney, Inc. an applicant must provide the following items: a completed loan application, the vehicle's title, proof of insurance, proof of registration, proof of income, and a spare key to the vehicle. AutoMoney, Inc. only accepts these items in person at its locations.

55.    Before determining the actual amount of a title loan, AutoMoney, Inc. must also appraise the vehicle.  Again, AutoMoney, Inc. only conducts appraisals at its locations.

56.    As noted previously, the Defendant signed North Carolina Department of Motor Vehicles ("NCDMV") Lien Recording Application providing that AutoMoney, Inc. held a security interest in the Collateral. Pursuant to the loan agreement, $20.00 of the Loan paid for the recording of this lien with the NCDMV. After the lien was recorded, the NCDMV issued new a title for the Collateral listing AutoMoney, Inc. as the first position lienholder thereto.

57.    AutoMoney, Inc.'s sole contacts with the State of North Carolina related to the Loan are (a) the recording of the lien with the NCDMV, which was necessary under applicable law as the Collateral is registered in North Carolina; (b) receipt in South Carolina of payments from North Carolina; and (c) possible

telephone calls after the Loans were made while the Defendant may have been in North Carolina. All these actions were necessary for the administration of the Loan after it was made.

58.    On November 1, 2019, AutoMoney, Inc. sold and assigned all its interests and rights in the Loans to Plaintiff, the present holder of the Loans.

## STATUTORY PREDICATES AND RELEVANT CASE LAW FOR CAUSES OF ACTION BELOW

59.    Plaintiff incorporates the allegations of paragraphs 1 through 58 as if fully set forth herein.

60.    The relevant provision of the NC Finance Act is N.C.G.S. § 53-190, entitled "Loan made elsewhere" (the "Extraterritorial Loan Statute"). Subsection (b) states: "If any lender or agent of a lender who makes loan contracts outside this State in the amount of the value of fifteen thousand dollars ($15,000) or less, comes into this State to solicit or otherwise conduct activities in regard to such loan contracts, then such lender shall be subject to the requirements of this Article."

61.    The Extraterritorial Loan Statute is inapplicable to AutoMoney, Inc. or the Plaintiff, which, as licensed South Carolina title lenders, does not enter North Carolina to solicit or conduct activities with respect to their title loans.

62.    In the alternative, if this Court should hold that Plaintiff's or AutoMoney, Inc.'s minimum necessary contacts for administrating loan

agreements with North Carolina borrowers implicates the Extraterritorial Loan Statute, then the enforcement of North Carolina consumer finance laws through the Extraterritorial Loan Statute violates the Commerce Clause of the United States Constitution by impermissibly regulating the Plaintiff's and AutoMoney, Inc.'s lending activities within the boundaries of South Carolina. See U.S. CONST., Art. I, § 8, cl. 3.

63.    The Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." Healy v. Beer Ins., 491 U.S. 324, 336 (1989) (quoting Edgar v. MITE Corp., 457 U.S. 624, 642-43 (1982) (plurality opinion)); see also Bigelow v. Virginia, 421 U.S. 809, 822-23 (1975) ("The Virginia Legislature could not have regulated the advertiser's activity in New York, and obviously could not have proscribed the activity in that State."). The Extraterritorial Loan Statute, if applied to Plaintiff or AutoMoney, Inc., would subject lending activity in South Carolina to North Carolina laws, contravening settled constitutional jurisprudence.

64.    The case of Midwest Title Loans, Inc. v. Mills, 593 F.3d 660 (7th Cir. 2010), cert. denied 562 U.S. 826 (2010), is directly on point. Judge Posner's opinion in Midwest Title addresses similar provisions of the Indiana's Uniform Consumer Credit Code (the "Indiana CCC") and holds that such provisions, nearly identical

in effect to the Extraterritorial Loan Statute at issue here, violates the Commerce Clause of the Constitution.

*65.*    The Indiana CCC was amended in 2007 to provide that any creditor entering into a "consumer sale, lease or loan transaction" with an Indiana resident in another state that "has advertised or solicited sales, leases, or loans in Indiana by any means, including by mail, brochure, telephone, print, radio, television, the Internet, or electronic means" is subject to the licensure provisions and maximum interest rate provisions of the Indiana CCC. 593 F.3d at 662.  Midwest Title, located in Illinois, issued title loans to Indiana residents at store locations in Illinois and advertised such loans on Indiana television. *Id.*

66.    Midwest Title filed suit against the Director of the Indiana Department of Financial Institutions under 42 U.S.C. § 1983 to enjoin permanently any enforcement of the statute against its stores. *Id.* at 661–62. Judge Posner issued an opinion affirming the permanent injunction granted at the trial court, holding that the Indiana statute at issue interfered with, and improperly regulated, title lending activities in Illinois, outside of Indiana's borders. *Id.* at 668–69. As Judge Posner analogized, a state may constitutionally ban, for example, the sale of foods containing trans fats or firecrackers within its <u>own</u> borders, but it <u>cannot</u> constitutionally ban such sales in a neighboring state merely because its residents may seek such products outside of its borders.    *Id.* at 669. Accordingly, the

extraterritorial provisions of the Indiana CCC—seeking to regulate and license lenders in other states, like Midwest Title—violated the Commerce Clause of the U.S. Constitution. *Id.*

67.     Defendant's position is that the North Carolina's Extraterritorial Loan Statute seeks to accomplish the same goal as the unconstitutional provisions of the Indiana CCC—subjecting lenders providing loans legal in their own states to North Carolina laws. If borrowers, such as the Defendant, are permitted to enforce North Carolina lending laws against title loans made by lenders like Plaintiff— title loans made within the borders of, and regulated by, South Carolina—such application would violate the Commerce Clause of the Constitution.

68.     The United States Court of Appeals for the Fourth Circuit has not addressed the extraterritorial application of consumer protection laws against title loan providers in other states under the Commerce Clause, but the Fourth Circuit has stricken state statutes as unconstitutional on the grounds that States cannot regulate commerce occurring outside of their borders under the principle of extraterritoriality.  See Ass'n for Accessible Meds. v. Frosh, 887 F.3d 664 (4th Cir. 2018); Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc., 492 F.3d 484 (4th Cir. 2007).

69.     In South Carolina, the elements of a breach of contract claim are: (1) the existence of a contract; (2) its breach; and (3) damages caused by such breach. *Branche Builders, Inc. v. Coggins*, 386 S.C. 43, 48, 686 S.E.2d 200, 202 (Ct. App. 2009).

## FIRST CAUSE OF ACTION
### (Declaratory Judgment as to the Applicability of North Carolina Law to the Loan Agreement)

70.     Plaintiff incorporates the allegations of paragraphs 1 through 69 as if fully set forth herein.

71.     Plaintiff is entitled to a declaration as to the construction of the Loan Agreement and its governing law provision that requires the application of South Carolina law.

72.     Plaintiff is entitled to a declaration that North Carolina law including – but not limited to – the North Carolina Consumer Finance Act and, specifically, N.C. GEN. STAT. § 53-190, "Loans made elsewhere," does not apply to the Loan Agreement as South Carolina must be applied.

## SECOND CAUSE OF ACTION
### (Claim for Declaratory and Injunctive Relief under the Commerce Clause Based on Invalid Extraterritorial Application of the North Carolina Consumer Finance Act)

73.     Plaintiff incorporates the allegations of paragraphs 1 through 72 as if fully set forth herein.

74.     The Commerce Clause prohibits the State of North Carolina from applying its laws extraterritorially to regulate commerce conducted outside the

State of North Carolina. See e.g., Healy v. Beer Institute, 491 U.S. 324 (1989); Ass'n for Accessible Meds. v. Frosh, 887 F.3d 664 (4th Cir. 2018); Midwest Title Loans, Inc. v. Mills, 593 F.3d 660 (7th Cir. 2010); Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc., 492 F.3d 484 (4th Cir. 2007).

75.    Plaintiff is entitled to a declaration that the North Carolina Consumer Finance Act, including – but not limited to – N.C. GEN. STAT. § 53-190, "Loans made elsewhere," violates the Commerce Clause if applied to the Loan Agreement because it violates the principle of extraterritoriality.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests that this Court enter a declaratory judgment ordering the following relief:

A.    Declaring that the Loans entered into between the Defendant and AutoMoney, Inc., now owned by Plaintiff, are governed only by South Carolina law due to a valid and enforceable South Carolina choice-of-law provision and are not governed by any provisions of the North Carolina statutes;

B.    Declaring that the NC Finance Act, including but not limited to the provisions of the Extraterritorial Loan Statute at N.C.G.S. § 53-190, does not apply to the Loans entered into with the Defendant;

C.    Declaring that the application of the NC Finance Act, including but not limited to the provisions of the Extraterritorial Loan Statute at N.C.G.S. § 53-

190, to AutoMoney, Inc. and its successor in interest, Plaintiff, or to the Loans

violates the Commerce Clause of the United States Constitution;

     D.    Such other and further relief as this Court deems just and appropriate.

    Respectfully submitted,

    THE LAW OFFICES OF L.W. COOPER JR., LLC

    */s/ Lindsey W. Cooper Jr.*
    Lindsey W. Cooper Jr. (D.S.C. No. 9909)
    Christina B. Humphries (D.S.C. No. 9984)
    36 Broad Street
    Charleston, SC  29401
    P: 843-375-6622
    F: 843-375-6623
    lwc@lwcooper.com
    christina@lwcooper.com

    *Attorneys for Auto Money North, LLC*

Charleston, South Carolina
January 12, 2021